***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are properly before the Industrial Commission, and the Commission has jurisdiction of the parties and of the subject matter. The parties are subject to and are bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. Liberty Mutual Insurance was the carrier at risk for workers' compensation coverage at all relevant times.
4. The date of the alleged injury was 4 March 1998.
5. Plaintiff's average weekly wage was $865.39 per week, resulting in a weekly compensation rate of $532.00 per week.
6. The parties stipulated into evidence a pretrial agreement marked as Stipulated 1.
7. Plaintiff tendered the following exhibits which were admitted into evidence at hearing before the Deputy Commissioner:
 Plaintiff's Exhibit No. 1 Curriculum Vitae of Marge McInnes
Plaintiff's Exhibit No. 2 EMS Report 4 March 1998
 Plaintiff's Exhibit No. 3 Medical Examiner Report dated 14 April 1998
Plaintiff's Exhibit No. 4 Picture of Sign in Window
Plaintiff's Exhibit No. 5 60 Minute Video
Plaintiff's Exhibit No. 6 60 Minute Video
Plaintiff's Exhibit No. 7 FMLA Request dated 12 May 1998
 Plaintiff's Exhibit No. 8 Division of Facilities Services Survey dated 8 April 1998
Plaintiff's Exhibit No. 9 Charter Greensboro Action Plan
 Plaintiff's Exhibit No. 10 Charter's Investigation of Death of Tristan Sovern
 Plaintiff's Exhibit No. 11 Charter Rebuttal to 6-8 April 1998 Survey Findings and Deficiencies
 Plaintiff's Exhibit No. 12 Settlement Agreement with Board of Nursing
 Plaintiff's Exhibit No. 13 First Interview with Board of Nursing dated 14 October 1998
 Plaintiff's Exhibit No. 14 National Practitioner Data Bank
 Plaintiff's Exhibit No. 15 Charter Settlement Agreement with Division of Facility Services
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on 29 October 1946. She currently resides in Boise, Idaho. Plaintiff did not graduate from high school; however, she obtained her GED in 1969. Thereafter, she obtained her BA in psychology and an associates degree to be a Registered Nurse in 1987.
2. Plaintiff's first job as a nurse was on an in-patient adolescent unit at Lake Hospital in Lake Worth, Florida, beginning in 1987 and continuing for approximately three years. Plaintiff's entire nursing career was spent working in psychiatric nursing.
3. Plaintiff began working for defendant-employer in January 1994, as charge nurse of the substance abuse unit. Subsequently, she inherited a second unit for the emotionally troubled. In July 1997, plaintiff was promoted to evening nurse supervisor where she worked until her total disability on 1 May 1998, and eventual termination by defendant-employer on 15 June 1998.
4. On 3 August 1995, while plaintiff was working with defendant, her son, who was 29 years old, was robbed and murdered in Alabama. As a result of his death, plaintiff missed approximately one week of work, and received medical treatment from her family physician for medical assistance and medication to help in dealing with his death. She went through two rounds, approximately 20 encounters each, of Hospice, which provides counseling for family members involved in the death of a loved one, to help resolve the grief involved with the death of her son. Subsequent to her son's death, although she took medication, plaintiff continued to work for defendant-employer without incident, and was promoted in July 1997 to evening nurse supervisor.
5. Plaintiff had a generalized anxiety disorder following her son's death, was going through menopause, and had experienced many stressors in her life prior to the 4 March 1998 death of Tristan Sovern, and the ensuing events. Although plaintiff took the medications Buspar, Lipitor and Premarin, in order to cope with stressors in her life and for medical conditions such as her generalized anxiety disorder, menopause and hyperlipidemia; she was able to work successfully, and in fact was a very strong and high functioning person prior to 4 March 1998.
6. On 4 March 1998, while working as evening nurse supervisor at defendant-employer's hospital and while responsible for everyone's well being at the hospital, including two to three units, plaintiff heard a page for "Code One Adolescent Unit". Code One indicates a psychiatric emergency and requires that all trained personnel respond immediately.
7. When plaintiff arrived at the psychiatric emergency on the adolescent unit, she observed six staff members holding Tristan Sovern, a very large, 206 pound 16 year old boy, down on the floor. One person was holding each limb, one his head, and one person was lying across his body.
8. Tristan Sovern was non-responsive to verbal de-escalation, and was thrashing about on the floor. He had obtained possession of a fishing hook with which he was threatening to commit suicide. Tristan, who was classified as a Willie M child, had a similar event requiring restraint the night before this incident. His treating physician did not believe in medicating adolescents and did not prescribe medication following that event.
9. As evening nurse supervisor, it was plaintiff's responsibility to make sure everyone was safe, and that all matters were proceeding according to hospital policies, procedures, and practice.
10. In that Tristan Sovern was a known biter and in accordance with hospital practice, a mouth covering was used to cover his mouth. Megan Duffany, the smallest person on the team, was responsible for securing the head and securing Tristan's mouth with a mouth covering. Initially Ms. Duffany attempted to use a small towel to secure his mouth, but the towel was too small to be effective. Then a regular towel was used to secure his mouth, but was also too small. Finally, plaintiff obtained a sheet in order for Ms. Duffany to secure Tristan's mouth prior to transporting him to the restraint room.
11. Upon arrival at the restraint room, Tristan was placed on the bed, and while applying the restraint, the team noticed that Tristan was lifeless. A "Code Blue" was initiated and 911 was called immediately. Psychiatric Emergencies usually do not involve a medical emergency. An ambulance transported Tristan to Wesley Long Memorial Hospital. Tristan was pronounced dead at 10:29 p.m. Detectives came to Charter Behavioral Health Center to investigate Tristan's death.
12. Plaintiff had no experience dealing with the death of a patient and had never experienced the death of a patient in all her years of nursing, particularly in that she was a psychiatric nurse.
13. Plaintiff treated with Dr. Aguilar on 17 March 1998, with complaints of a great deal of stress due to the death of Tristan Sovern, which resulted in increased palpitations, tremulousness, insomnia, crying spells, and a generalized state of despair. She was next examined on 7 April 1998, with complaints of stress-related pneumonia.
14. On 6 May1998, plaintiff was seen at Green Valley Psychiatric Group by Nancy Long and by Dr. Douglas Smith. She told Dr. Smith that she was experiencing anxiety, difficulty sleeping and concentrating, decreased energy, tearfulness, flashbacks, fear of having the same trauma happen again, inability to report to work, fear of safety at work, fear of legal charges, out of control, failure of coping skills, and panic-like symptoms as a result of the Tristan Sovern death incident. Dr. Smith diagnosed plaintiff with post-traumatic stress disorder, defined by Dr. Smith as follows: "The essence of post-traumatic stress disorder involves the exposure to an extremely stressful event, emphasis being something that is extremely traumatic and extremely stressful." He further stated that the disorder "involves an intense fear as a result of the event, often associated with a sense of helplessness over being able to control the outcome. Then over time a person with PTSD will re-experience a traumatic event in various ways." Dr. Smith noted that plaintiff was "having flashbacks of the incident," and that "[s]he was fearful that the same type of incident might happen again, and basically was paralyzed in her ability to function at that point." Dr. Smith wrote plaintiff out of work completely until further notice. He continues to treat plaintiff in conjunction with the therapist in his office.
15. On 12 May 1998, plaintiff completed a Family Medical Leave Request in which she sought personal medical leave beginning on 6 May 1998 and continuing for an unknown period of time.
16. Following Tristan Sovern's death, plaintiff contacted her superiors and wrote a report regarding the incident. In addition, she was required to retell the events multiple times to her supervisors, local and corporate administrators, police detectives, EMS personnel, Tristan Sovern's adoptive family and the nursing board. She also had to repeatedly dwell on the incident in conversations with her attorney and corporate attorneys for defendant-employer in the preparation for her testimony in the criminal trial of Megan Duffany which ensued, in preparation for testimony before the nursing board, and for statements given to the Division of Facility Services.
17. Plaintiff endured multiple encounters regarding this incident involving the death of Tristan Sovern, in that it gained national attention, appeared as a feature story on 60 Minutes twice, and was the subject of numerous newspaper articles. Following the death of Tristan, plaintiff was on one occasion confronted with a sign in a window of a store in Greensboro which read, "Tristan Sovern White Male Age 16, Murdered 4 March 1998. The ultimate violation of anyone's Civil Rights is an act of violence." In addition, plaintiff understood that as there is no statute of limitations for murder, she had the constant fear of being arrested on such a charge.
18. Dr. Smith opined that one of the effects of the press coverage, the constant revisiting of the experience with attorneys and the ongoing threat of being charged with murder was the further heightening of plaintiff's anxiety symptoms resulting from the death of Tristan Sovern, which prevented her from effectively beginning any type of recovery process.
19. As a result of the death of Tristan Sovern, plaintiff's North Carolina nursing license was suspended. Her license was reinstated in October 1999. The National Practitioner's Data Bank, which exists on the Internet, reflects that plaintiff is a registered nurse in North Carolina, but that she had her license suspended on 10 May 1999, as a result of neglect and failure to supervise. She has not obtained a nursing license in Idaho, the state where she currently resides.
20. As a result of the death of Tristan Sovern, plaintiff is terrified of becoming involved in a crisis situation. Although plaintiff continued to work until 6 May 1998, Dr. Smith is of the opinion that plaintiff has been totally disabled from all employment from 4 March 1998 through the present and continuing, and that the medical treatment plaintiff has received has been imperative to either effect a cure or provide relief or lessen her period of disability. Dr. Smith described the symptoms of PTSD as hyperarousal, such as anxiety, agitation, restlessness and insomnia. He noted that the symptoms must be persistent for at least a month after the traumatic incident which caused the disorder, and that there must be some significant impairment in a person's ability to function as a result of the symptoms. Dr. Smith opined that the incident of 4 March 1998 directly caused plaintiff's post traumatic symptoms, and that she exhibited the symptomatic criteria for PTSD during his initial evaluation of her on 6 May 1998.
21. Dr. Smith further opined that plaintiff's position as the psychiatric nurse with the job duties she had on 4 March 1998, placed her at an increased risk of developing PTSD over that of the general public not so employed.
22. At the time of the hearing before the Deputy Commissioner, plaintiff's medication for post-traumatic stress disorder included Klonopin 1 mg. 3 4 times daily, Ambien 10 mg. once at night, and Zoloft 25 mg. once a day. In addition, plaintiff takes Diltiazer 180 mg., Lipitor 10 mg., Premarin 1.25 mg., and Allegra 180 mg., for other medical conditions.
23. Plaintiff had a psychiatric independent medical exam with Dr. Steven Sanders on 17 February 2000, prior to obtaining an award of social security disability.
24. Although plaintiff experienced some incidents of anxiety and depression prior to the 4 March 1998 incident, Dr. Smith opined that there is no way to apportion any of these experiences from the PTSD which resulted from the incident at defendant-employer's hospital.
25. Plaintiff became totally disabled and unable to work as a result of her post-traumatic stress syndrome on 6 May 1998, and continues to be totally disabled. Plaintiff has not reached maximum medical improvement.
26. Defendant Employer terminated plaintiff pursuant to a settlement agreement with the Department of Facility Services on 15 June 1998, as a result of the death of Tristan Sovern.
27. On 20 May 2000, Dr. Smith recommended that plaintiff relocate to an area outside of Greensboro and to an area where she would have a support network. Plaintiff relocated to Boise, Idaho on 2 June 2000. Plaintiff continues to experience flashbacks, paranoia, inability to complete tasks, racing thoughts, poor memory, poor concentration, panic attacks, recurring flashbacks and fear when the telephone rings, the mail or e-mail arrives, and when the doorbell rings. She also has fractured relationships with people; she is socially avoidant; she performs at a low level, is easily overwhelmed and she feels lost, anxious, restless, is unable to retain information, and has mood swings.
28. The sudden emergency situation on 4 March 1998, that plaintiff participated in and was responsible for in her role as supervisor over the other participants and which led to the death of Tristan Sovern, constituted an interruption of plaintiff's normal work routine and an introduction of unusual conditions likely to result in unexpected consequences; therefore, it constitutes an injury by accident. The incident plaintiff experienced on 4 March 1998 while participating in and supervising the use of restraints to control Tristan Sovern, an emotionally disturbed, out of control teenager, and which caused his death, caused plaintiff to develop post traumatic stress disorder, a mental injury which rendered her totally disabled. Plaintiff's mental injury flowed directly from and was a direct consequence of her participation, actual and supervisory, of the accidental death of Tristan Sovern. Therefore, plaintiff sustained a mental injury by accident arising out of and in the course of her employment on 4 March 1998.
29. More weight is given to the diagnosis and treatment of plaintiff by Dr. Douglas G. Smith than the testimony of Dr. David B. Marcotte in that Dr. Marcotte only saw plaintiff once.
30. As the Commission is determining that plaintiff sustained an injury by accident, the Commission is not reaching the issue of whether plaintiff's disability is due to an occupational disease contracted from her employment.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. An injury by accident may be inferred "when an interruption of the work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences occurs." Gunter v. Dayco Corp.,317 N.C. 670, 673, 346 S.E.2d 395, 397 (1986). In the instant case, plaintiff sustained an injury by accident resulting in post-traumatic stress disorder, a mental injury that arose out of and in the course of her employment with defendant-employer on 4 March 1998. Mental impairments are compensable under the Workers' Compensation Act so long as the resulting disability meets the statutory requirements. Accordingly, plaintiff is eligible for compensation under the Act. N.C. Gen. Stat. § 97-2(6). See also, Jordan v. Central Piedmont CommunityCollege, 124 N.C. App. 112, 476 S.E.2d 410 (1996).
2. As a direct and proximate result of her compensable injury by accident, plaintiff has been and continues to be totally disabled from any employment and is entitled to compensation for temporary total disability from 6 May 1998, and continuing, until further order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to have defendants provide all medical compensation incurred or to be incurred in the future which arises from her compensable injury by accident resulting in post-traumatic stress syndrome. N.C. Gen. Stat. § 97-25.
4. Plaintiff is not at maximum medical improvement as to the post-traumatic stress syndrome.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney's fees herein below approved, defendants shall pay to plaintiff total disability benefits at the rate of $532.00 per week beginning 6 May 1998 and continuing until such time as plaintiff has returned to work earning the same or greater wages as she was earning at the time of her disability or further orders of the Industrial Commission. All accrued benefits shall be paid in one lump sum, subject to attorney's fees approved below.
2. Defendants shall pay for all medical expenses incurred or to be incurred in the future by plaintiff as a result of her compensable injury when bills for same have been submitted to and approved by the Industrial Commission, for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
3. An attorney's fee of 25% of the compensation due plaintiff herein is hereby approved for plaintiff's counsel as reasonable attorney's fees, and shall be paid to plaintiff's counsel as follows: One fourth of the lump sum award due to plaintiff shall be paid directly to plaintiff's counsel. Thereafter, every fourth payment of compensation shall be paid by defendants directly to plaintiff's counsel.
4. Defendants shall pay the costs of this action.
This the _____ day of February, 2002.
 S/_____________________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_____________________________ CHRISTOPHER SCOTT COMMISSIONER
S/_____________________________ DIANNE C. SELLERS COMMISSIONER